UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

New Cingular Wireless PCS, LLC,
      Plaintiff

      v.                                    Case No. 11-cv-334-SM
                                            Opinion No. 2014 DNH 044
City of Manchester, NH; and
Zoning Board of Adjustment
of the City of Manchester, NH,
      Defendants

**O R D E R**

Plaintiff, New Cingular Wireless PCS, LLC ("AT&T"), proposes to construct a cell tower in Manchester, New Hampshire, to fill a gap in cellular telephone coverage.  The Zoning Board of Adjustment of the City of Manchester ("Board") denied an area variance twice - once prior to the filing of this suit, and once on remand by consent of the parties.  AT&T sues the City of Manchester ("City") and the Board under the Telecommunications Act of 1996, 47 U.S.C. § 151 et. seq. ("TCA") and section 677:4 of the New Hampshire Revised Statutes Annotated.

AT&T argues that the Board's decisions to deny the variance are not supported by substantial evidence (Count I), result in an effective prohibition on the extension of personal wireless services in an identified coverage gap (Count II), and violate state law (Count V).  Before the court are the parties' cross-motions for summary judgment on Count II (document nos. 28 and 31).  After the motions were filed, the parties stipulated to all

material facts and submitted all counts for trial by the court as a case stated.  The court held a hearing on February 20, 2014.


Having heard the parties' arguments and having carefully reviewed and considered the evidence presented, the court makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 52(a).  The court notes that AT&T submitted a very detailed and extensive set of proposed findings and conclusions.  It is well settled, however, that the court "does not have to make findings on every proposition put to it by the parties."  Applewood Landscape & Nursery Co. v. Hollingsworth, 884 F.2d 1502, 1503 (1st Cir. 1989) (quoting Morgan v. Kerrigan, 509 F.2d 580, 588 n.14 (1st Cir. 1974)).  Rather, the findings simply need be "sufficient to indicate the factual basis for the ultimate conclusion."  Kelley v. Everglades Drainage District, 319 U.S. 415, 422 (1943) (per curiam).  If either party believes that additional findings of fact and conclusions of law, beyond those made below, are necessary to support the court's ruling or clarify the status of a claim or defense, it should submit a written request for (a limited number of) additional findings and conclusions within fifteen days of the date of this Order.


## Background

1.      The City of Manchester's zoning ordinance prohibits the siting of wireless communication facilities in 80-85% of the

2

City, including all residential zoning districts, except
that variances may be allowed.

2.      On December 21, 2010, AT&T applied for variances from
certain sections of the ordinance to construct a 100' tower
facility at 235 South Mammoth Road in Manchester, which is
located in an R-1B Residential District.  AT&T sought to
address coverage problems in and around the R-1A and R-1B
Residential Districts in south central Manchester, where
telecommunications towers and antennas are not permitted.

3.      After public hearings in January and February of 2011,
the Board voted 3-2 to approve AT&T's application, subject
to two conditions.

4.      At the request of individuals opposed to construction
of the tower, however, the Board held a rehearing on April
14, 2011, and reversed itself, voting 4-1 to deny the
variances.  AT&T's own subsequent request for a rehearing
was denied in June of 2011 and AT&T appealed.

5.      At the parties' request, the court, by order dated July
25, 2013 (document no. 58), remanded this matter to the
Board "for the limited purpose of allowing the Board to
consider AT&T's additional information."

6.      On September 25, 2013, the Board held a public hearing to consider AT&T's additional information.  The Board voted 3-1 to affirm its denial of AT&T's variance application.  It denied AT&T's subsequent request for rehearing.

7.      AT&T's second amended complaint includes an appeal and challenge to both the Board's original denial of AT&T's application in April of 2011, and its denial after remand in September of 2013.

## Count I Effective Prohibition Under
## 47 U.S.C. § 332(c)(7)(B)(i)(II)

8.      The TCA provides, in part, that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(II).

9.      The court reviews AT&T's effective prohibition claim de novo.  <u>National Tower, LLC v. Plainville Zoning Bd. of Appeals</u>, 297 F.3d 14, 22 (1st Cir. 2002).

10.      When a carrier claims an individual denial [of a permit] is an effective prohibition, virtually all circuits require courts to (1) find a 'significant gap' in coverage

4

exists in an area and (2) consider whether alternatives to the carrier's proposed solution to that gap mean that there is no effective prohibition." <u>Green Mountain Realty Corp. v. Leonard</u>, 688 F.3d 40, 57 (1st Cir. 2012) (quoting <u>Omnipoint Holdings, Inc. v. City of Cranston</u>, 586 F.3d 38, 48 (1st Cir. 2009)).

11.     The City's denials of AT&T's site-specific application in 2011 and 2013, individually and in combination with the City's failure to lease AT&T a suitable nearby city-owned alternative property because of neighborhood opposition, effectively prohibit AT&T from providing competitive and reliable personal wireless services in the residentially-zoned area.

### *Significant Coverage Gap*

12.     AT&T has a significant gap in coverage in Manchester within the meaning of the TCA and AT&T's proposed facility will address that coverage gap.

13.     In finding that a significant coverage gap exists, the court has considered factors such as the physical size of the gap, the number of users the gap affects, percentages of unsuccessful calls or inadequate service during calls in the gap area, the need for coverage around a heavily traveled and important route, and the carrier's "standard for

reliable service . . . to satisfy customers" based on "signal levels." <u>Omnipoint</u>, 586 F.3d at 48.

14.     Lack of reliable in-building coverage is also a relevant consideration.  <u>See</u> <u>U.S.C.O.C of NH v. Town of Dunbarton</u>, 2005 WL 906354, at *5 (D.N.H. April 20, 2005) (DiClerico, J.).  Reliable in-building coverage is essential to consumers and carriers.  <u>T-Mobile v. City of Huntington Beach</u>, 2012 WL 4867775, at *4-5 (C.D. Cal. 2012).  AT&T has proven the lack of reliable in-building coverage in the relevant target area.

15.     The evidence establishes that AT&T has a significant gap in coverage within the meaning of the TCA.  The coverage problems extend nearly three square miles along and surrounding South Mammoth Road in Manchester (the "target area").  AT&T's coverage problems in Manchester affect an area large in size and highly populated, and affect highly traveled roads and numerous homes.

16.     Expert testimony, AT&T network performance data, and drive tests all demonstrate that AT&T is unable to provide competitive, reliable in-building wireless service to numerous businesses and residences in the target area. Specifically, within a densely populated, residentially zoned area measuring about 1.6 miles (north to south) by 1.8

miles (east to west), AT&T has in-building coverage gaps of marginal or no service affecting some 2600 residents who live in the area.

17.      In addition, residents in the target area and tens of thousands of drivers daily along South Mammoth Road and connector streets experience "pilot pollution" interference problems.

18.      Moreover, the significant daily traffic volume on South Mammoth Road and its connector streets, and on I-93, I-293, and NH Route 101 (daily traffic volumes of 47,000 to 102,000) lead to capacity problems in and around the target area.

19.      In the absence of the proposed facility, consumers in the target area have experienced and will experience, as a result of pilot pollution and capacity problems, increased interference, repeated and ineffective handovers, dropped calls, network congestion, an increase in the noise floor of the system, and the forced hand-down of users from high speed 3G to slower 2G service.

20.      AT&T's coverage problems in the target area are a reflection of the exponential growth in the use of wireless technology for voice, text and data applications, social

media and internet access, emergency communications, and other uses.

21.      AT&T's proposal advances the TCA's important national goals of "creating a seamless national wireless communication system" and of "encouraging competition" among carriers to provide consumers with "higher-quality wireless technology."

### *No Feasible Alternatives*

22.      There are no feasible alternatives to AT&T's proposed solution.  AT&T's proposal is the only feasible plan to address its coverage problems in Manchester.

23.      Ironically, the City has itself twice refused, because of neighborhood pressure, to lease the nearby and perfectly acceptable Manchester Water Works property to AT&T as an alternative site for the proposed facility, thereby forcing the location into a less amenable neighborhood and foregoing an income stream.

24.      AT&T has shown that other potential sites are not feasible for coverage reasons, the unwillingness of property owners to rent, or both.

25.     Moreover, AT&T "investigated thoroughly the possibility of other viable alternatives" before concluding that no other feasible plan exists, <u>Omnipoint</u>, 586 F.3d at 50.  The City's suggested alternatives are not feasible.

26.     For example, the Engine 8 site is not a feasible alternative.  The tower at that site would need to be taller than 200 feet to provide the necessary coverage.  But the Federal Aviation Administration cannot approve a tower of that height at the Engine 8 property because of its close proximity to the Manchester Airport.  The Engine 8 site is also too small, given its configuration, to accommodate AT&T's equipment.

27.     The Church of God and Green Acres/McLaughlin school locations are not feasible alternative sites.  A tower at each of those sites would, necessarily, have to be at least 146-159 feet tall.  Moreover, the sites are located in the same residential neighborhood where residents have opposed both the proposed facility and the alternative Water Works site.  A tower at either location would be even more visible because the sites have substantially less tree cover than AT&T's proposed site; and one site is near a school whose principal objects to a tower.

28.     To the extent the City "could prefer other solutions on aesthetic grounds," <u>Second Generation Properties v. Town of Pelham</u>, 313 F.3d 620, 631 (1st Cir. 2002), it has failed to specifically identify any such feasible alternative solution (and, as noted, will not lease its own Water Works site - surely an aesthetically more pleasing option).  There is no evidence that such a feasible alternative exists.

### Substantial Evidence Claim
### 47 U.S.C. Sec. 332(c)(7)(B)(iii)

29.     The TCA provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C § 332(c)(7)(B)(iii).

30.     "Substantial evidence does not mean a large or considerable amount of evidence, but rather such evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>ATC Realty v. Town of Kingston</u>, 303 F.3d 91, 94 (1st Cir. 2002).

31.     Nevertheless, judicial review for substantial evidence is not a "rubber stamp."  A town board "is not free to prescribe what inferences from the evidence it will accept

10

and reject, but must draw all those inferences that the
evidence fairly demands."  Southwestern Bell Mobile Sys. v.
Todd, 244 F.3d 51, 59 (1st Cir. 2001).

32.      In New Hampshire, "[t]o obtain a variance, a landowner
bears the burden of showing that (1) the variance will not
be contrary to the public interest; (2) special conditions
exist such that literal enforcement of the ordinance results
in unnecessary hardship; (3) the variance is consistent with
the spirit of the ordinance; (4) substantial justice is
done; and (5) granting the variance will not diminish the
value of surrounding properties."  Farrar v. City of Keene,
158 N.H. 684, 688 (2009).  See also N.H. Rev. Stat. Ann. §
674:33, I(b).

33.      In February of 2011 the Board found that AT&T had
satisfied all statutory criteria for the requested
variances.  Two months later, on April 14, 2011, the Board
reached the direct opposite conclusion, and denied the
variances.

34.      The Board gave the following reasons for its denial:
(i) the facility was not in the public interest; (ii)
because wireless communications facilities are permitted as
of right in other districts, the facility was not in the
"spirit" of the zoning ordinance; (iii) substantial justice

11

would not be done to the neighborhood due to construction at
the site, ongoing noise from the generator and routine
maintenance; (iv) expert testimony submitted by the abutters
indicated that property values would be diminished; and (v)
no hardship existed because research had not been done with
regard to finding multiple structures, higher structures, or
antennas "hidden" in existing structures, and the facility
could not be considered a reasonable use in the single-
family neighborhood.

35.      The Board's April 2011 denial of AT&T's application,
and the reasons it offered in support, are not supported by
substantial evidence.

### *Spirit of the Zoning Ordinance*

36.      Substantial evidence does not support the Board's
finding that the requested variances would be contrary to
the spirit of the zoning ordinance.  The only reason the
Board gave for that finding is that "[t]elecommunications
towers are permitted in the B-2, IND and RDV zones."  But
that is classic circular reasoning.  Essentially, the Board
"determined that the variance would violate the spirit of
the ordinance because it violated the ordinance."  New
Cingular Wirless v. Town of Greenfield, 2010 WL 3528830, at
*5 (D.N.H. 2010).  Accordingly, the Board failed to give "a

12

sufficient explanation" for its finding.  Id.  The point of a variance is to permit an otherwise impermissible use.

### *Public Interest*

37.     The Board's conclusion that the requested variances would not be in the public interest is likewise not supported by substantial evidence.

38.     The Board found that "[t]he proposed telecommunications tower at this location would not be in the public interest given the number of residents in opposition at the hearing" and the purported fact that these residents were not given enough information and were not allowed "reasonable access to the submitted report prior to the meeting."

39.     The simple fact, cited by the Board here, that many neighbors opposed the tower, is not substantial evidence supporting the Board's denial.  Cf. Sprint Spectrum, L.P. v. Cty. of St. Charles, 2005 WL 1661496, at *6 (E.D. Mo. July 6, 2005) (finding that "[a] 'not in my backyard' generalized objection does not constitute substantial evidence to support the denial of a tower permit.").

40.     The Board's additional finding that neighbors were not allowed "reasonable access to the submitted report prior to the meeting," likewise, is not substantial evidence

supporting the Board's public interest rationale.  The Board
continued the hearing on AT&T's application, allowing
interested persons more than sufficient time to review the
application.

41.      A variance is contrary to the public interest if it
"unduly, and in a marked degree conflicts with the ordinance
such that it violates the ordinance's basic zoning
objectives."  <u>Greenfield</u>, 2010 WL 3528830, at *5 (quoting
<u>Farrar</u>, 158 N.H. at 688).

42.      AT&T's proposal does not unduly and in a marked degree
conflict with the ordinance's basic purposes, and in fact,
promotes them in substantial part.  The provision of
wireless communication coverage directly advances the
ordinance's stated purposes of protecting and promoting
public safety, and enhancing convenience, comfort,
prosperity, and general welfare of Manchester's residents.
The evidence demonstrates that the proposed site would
further economic development and public safety.

43.      The proposed facility would not undermine the
ordinance's stated purposes of "conserving property values
by preventing harmful encroachment of incompatible uses" and
"encouraging the most appropriate use of land." The tower
will be located in the middle of a 4.5 acre parcel; buffered

14

by substantial setbacks; disguised, at least somewhat, as a
faux tree; and screened by tall existing trees.

44.      Although the top of the tower will be seen from several
vantage points, "in nearly every documented instance, all
that would be visible is a small portion of the top of the
tower extending above the treetops." Greenfield, 2010 WL
3528830, at *7.

### *Substantial Justice*

45.      The Board concluded that "[s]ubstantial justice would
not be done to the neighborhood as there will be
construction at the site, on-going noise from the generator
and routine maintenance."  That rationale is not supported
by substantial evidence.

46.      The Board's determination fails to account for the fact
that the construction noise will be temporary; that the
generator, except in emergencies, will run only briefly
during weekly testing (lasting 30 minutes); and that the
unmanned facility will be visited by a technician on an
infrequent basis for routine maintenance.

47.      The Board's determination also "fails to account for
substantial benefits the public will obtain if the tower is
built as proposed." Id.

48.     The benefits ignored by the Board include: advancing
        the significant public purposes of the TCA; improving
        advanced, seamless, competitive, state-of-the-art wireless
        communication coverage in the target area in Manchester,
        which, among other things will enhance public safety and
        economic development; and providing opportunities for
        collocation, which would diminish the need for other
        carriers to build their own towers in the vicinity.

49.     In the end, the Board impermissibly failed to weigh
        predictable localized concerns against those "gain[s] to the
        general public." Id.

***Property Values***

50.     The fourth reason the Board gave for denying AT&T's
        request was that the proposed facility would diminish
        property values.  That determination is not supported by
        substantial evidence.

51.     The sole expert report upon which the Board relied is
        not site-specific, is factually inaccurate, and relies upon
        a flawed methodology.

52.     The Board ignored the reports of AT&T's experts –
        reports that showed that property values would not be
        diminished.  The reports included a site-specific Market

Study; a study of telecommunications towers in Manchester; and studies of the effect of telecommunications towers located in several communities near Manchester.  See generally Southwestern Bell, 244 F.3d at 59 (a board "'is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands.'") (quoting Allentown Mack Sales & Serv. v. NLRB, 522 U.S. 359, 378 (1998)).

### Unnecessary Hardship

53.     The Board also determined that AT&T had not met its burden of showing that a denial of its request would be an "unnecessary hardship" because "[r]esearch had not been done at other locations with regards to finding multiple structures, higher structures or antennas hidden in existing structures."  The Board also found that "[t]he telecommunication tower could not be considered a reasonable use in this single-family neighborhood."  The Board's finding regarding hardship is not supported by substantial evidence.

54.     The Board's rationale is factually flawed.  As the court has already found, AT&T has, in fact, conducted research at other locations, and has demonstrated that there are no feasible alternatives to address the coverage and

17

capacity needs (except, of course, the City's own Water Works site).

55.     In addition, as already found, AT&T has demonstrated that it has an immediate and compelling need to locate a tower in the target area of Manchester to address significant coverage issues.

56.     "When an application to build a wireless telecommunications tower is designed to fill a significant gap in coverage, the suitability of a specific parcel of land for that purpose should be considered for purposes of determining hardship.  The fact that a proposed location is centrally located within the gap, has the correct topography, or is of an adequate size to effectively eliminate the gap in coverage, are factors that may make it unique under the umbrella of the TCA."  Daniels v. Town of Londonderry, 157 N.H. 519, 527 (2008).

57.     The proposed site, here, is "unique under the umbrella of the TCA" because of its large size, favorable topography, proximate location to the area requiring service, significant setbacks, extensive masking tree coverage and vegetation, and its proximity to several heavily traveled state and interstate highways.

58.     The Board's additional finding that a tower would not be a "reasonable use" within the single-family neighborhood skirts the hardship question, since the hardship standard applies to "both the use and area variances."  <u>Id</u>.

59.     On September 25, 2013, after remand, the Board again denied AT&T's variance application.  The Board stated that AT&T "failed to show that they did their due diligence in acquiring an alternative location" and "failed to prove that alternative sites were unacceptable."

60.     The Board's findings are not supported by substantial evidence.  As already noted, AT&T diligently evaluated and ruled out numerous alternatives, and the feasible alternative of the Water Works site was made unavailable by the City itself.

**State Law Claim**

Because the City's decision violates the TCA, it is unenforceable.  It is unnecessary (even if appropriate - which may be doubtful) therefore, to resolve AT&T's state law claim, which is deemed moot.  <u>See</u> <u>Nextel v. Town of Wayland</u>, 231 F. Supp. 2d 396, 410 (D. Mass. 2002).

**Conclusion**

The Board's 2011 and 2013 denials of AT&T's variance applications, violated the TCA's effective prohibition ban.  In addition, the Board's decisions are not supported by substantial evidence.  Accordingly, those decisions are reversed.

In this case, "like in the majority of cases, the proper remedy for a zoning board decision that violates the" TCA is an order "instructing the board to authorize construction." National Tower, 297 F.3d at 21-22.  An injunction is warranted here in order to avoid "multiple rounds of decisions and litigation" and because a second remand to the Board would "serve no useful purpose."  Id; Brehmer v. Planning Board, 238 F.3d 117, 120 (1st Cir. 2001).  Accordingly, the Board shall promptly authorize construction of the tower as proposed and subject to the conditions imposed by the Board in its February 10, 2011, initial approval of AT&T's application.

Plaintiff's motion for partial summary judgment (document no. 28) is granted.  Defendants' cross-motion for partial summary judgment (document no. 31) is denied.

Plaintiff's "Assented to Motion to Amend Complaint" (document no. 66) is granted.  Defendants' "Motion to Strike the Supplemental Affidavit of Daniel L. Goulet" (document no. 37) is denied.  Plaintiff's "Motion in Limine to Preclude Defendants

from Relying on Inadmissible and Irrelevant Information in the Board Record" (document no. 46) is denied.  Plaintiff's "Supplemental Motion in Limine to Preclude Defendants from Relying on Inadmissible and Irrelevant Information in the Board Record" (document no. 70) is denied.


The clerk of the court shall enter judgment in accordance with this order and close the case.


**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

February 28, 2014

cc:  Stephen D. Anderson, Esq.
     Peter R. Chiesa, Esq.
     Adam T. Kurth, Esq.
     Anne Robbins, Esq.